Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued September 11, 2003      Decided December 16, 2003

No. 02-5224

DORIS R. FORETICH, ET AL.,
APPELLANTS

DISTRICT OF COLUMBIA, OFFICE OF THE MAYOR,
APPELLEE

v.

UNITED STATES OF AMERICA,
OFFICE OF THE ATTORNEY GENERAL AND
JEAN ELIZABETH MORGAN, M.D.,
APPELLEES

————

Appeal from the United States District Court
for the District of Columbia
(No. 97cv00929)

————

*Jonathan Turley* argued the cause and filed the briefs for appellants.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Marina Utgoff Braswell*, Assistant U.S. Attorney, argued the cause for appellees. With her on the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, *R. Craig Lawrence*, Assistant U.S. Attorney, and *Stuart F. Delery* and *David S. Mendel*. *Stephen H. Sachs* entered an appearance.

Before: EDWARDS, RANDOLPH, and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* TATEL.

EDWARDS, *Circuit Judge*: In this case, appellants, Dr. Eric A. Foretich and his parents, challenge the constitutionality of the Elizabeth Morgan Act ("the Act"), claiming that the Act is a bill of attainder. On the record before us, we find that Congress violated the constitutional prohibition against bills of attainder by singling out Dr. Foretich for legislative punishment. We therefore reverse the judgment of the District Court.

Dr. Foretich and his former wife, Dr. Jean Elizabeth Morgan, have contested visitation and custody rights with respect to their daughter, Hilary, since Hilary's birth in 1982. In 1984, the D.C. Superior Court awarded custody to Dr. Morgan and broad visitation rights to Dr. Foretich. Notwithstanding repeated orders of the Superior Court, Dr. Morgan continually objected to and obstructed Dr. Foretich's rights, claiming that Dr. Foretich and his parents had sexually abused Hilary. Dr. Morgan's accusations of sexual abuse were heard and considered by the Superior Court, but her charges were never credited. Nevertheless, Dr. Morgan persisted in her claims and continued to rebuff Dr. Foretich's efforts to secure visitation rights with his daughter. In her final act of defiance, Dr. Morgan hid Hilary from the court and from the child's guardian *ad litem* and refused to reveal her whereabouts. Dr. Morgan consequently served over two years in jail on civil contempt charges and ultimately fled the country to go into hiding with her daughter.

The Morgan-Foretich custody dispute gained extraordinary notoriety in the media as Dr. Morgan pressed her unproven

charges of sexual abuse against Dr. Foretich and his parents. In September 1996, Congress intervened and passed the Elizabeth Morgan Act. The Act achieved two principal aims. First, Dr. Morgan and her daughter were able to return to the United States without being subject to the outstanding orders of the D.C. Superior Court. Second, even though the Superior Court had never credited Dr. Morgan's allegations of sexual abuse and had deemed Hilary's visitation with her father to be in the child's best interests, the Act made it clear that Dr. Foretich could no longer secure visitation with his daughter without first obtaining Hilary's consent. Dr. Morgan returned to the United States with Hilary shortly after the Act's passage.

The Elizabeth Morgan Act gives a fleeting hint of neutrality, referring to "any pending case involving custody over a minor child," as if to suggest that the Act is broad in scope. However, the Act then goes on to describe the "visitation rights of a parent of a minor child in the Superior Court which is described in subsection (b)," and states that, "after *the child* attains 13 years of age, *the party* to the case who is described in subsection (b)(1) may not have custody over, or visitation rights with, *the child* without *the child*'s consent." It is clear from the terms of subsection (b) that "the party" to whom the Act refers is Dr. Foretich and "the child" is his daughter, Hilary. Indeed, the Government concedes that the Act is aimed solely at Dr. Foretich.

On June 19, 1997, while Hilary was still a minor, Dr. Foretich and his parents filed this lawsuit against the United States challenging the Act as an unconstitutional bill of attainder and a violation of due process, separation of powers, and principles of D.C. home rule. Dr. Morgan intervened as a defendant. Five years later, the District Court rejected Dr. Foretich's constitutional claims and granted summary judgment in favor of the United States and Dr. Morgan. *Foretich v. United States*, Civ. Action No. 97-0929 (D.D.C. Jun. 13, 2002) ("*Foretich*"), *reprinted in* Joint Appendix ("J.A.") 18-30.

We reverse the judgment of the District Court and hold the Elizabeth Morgan Act to be an unconstitutional bill of attain-

der. Despite a feeble attempt at generality, there is no doubt that Congress targeted Dr. Foretich for application of the Act's unique child custody standard. The Government's concession on this point merely confirms what is otherwise clear: Congress singled out Dr. Foretich on the basis of a judgment that he committed criminal acts of child sexual abuse. The Act thus embodies legislative determinations that Dr. Foretich was a danger to his child and that the custody dispute had to be resolved against him in order to protect Hilary from future harm. In making those determinations, Congress both inflicted extraordinary reputational injuries upon Dr. Foretich that support our jurisdiction over this lawsuit and imposed "punishment" within the meaning of the Bill of Attainder Clause. We therefore find that Congress violated the constitutional prohibition against bills of attainder by singling out Dr. Foretich for legislative punishment.

## I. BACKGROUND

This appeal arises against the backdrop of a bitter and protracted dispute between appellee Dr. Jean Elizabeth Morgan and her former spouse, appellant Dr. Eric A. Foretich, over the custody of their daughter, Hilary A. Foretich. Hilary, who is now known as Ellen Morgan, was born in Washington, D.C., on August 21, 1982. By the time of her birth, Hilary's parents were already separated, and custody proceedings in the District of Columbia Superior Court soon followed. *See Morgan v. Foretich*, Civ. Action No. D-684-83, slip op. at 3 (D.C. Super. Ct. Nov. 8, 1984) ("*1984 Custody Order*"), *reprinted in* J.A. 270. Pending the outcome of the litigation, Dr. Morgan retained custody of Hilary, though Dr. Foretich and his parents spent time with Hilary on several occasions pursuant to court orders. *See 1984 Custody Order*, slip op. at 9-10, J.A. 276-77; Am. Compl. ¶¶ 25-27, J.A. 110-11. Dr. Morgan objected to these visits, and on several occasions in 1984 the Superior Court found it necessary to admonish Dr. Morgan for obstructing Dr. Foretich's visitation with Hilary. *See 1984 Custody Order*, slip op. at 9-10, J.A. 276-77; Am. Compl. ¶¶ 28-29, J.A. 111.

On November 8, 1984, the D.C. Superior Court awarded custody of two-year-old Hilary to Dr. Morgan, but permitted broad visitation for Dr. Foretich. *1984 Custody Order*, slip op. at 24-26, J.A. 291-93. The court found that Dr. Foretich had "built a fine home life" for Hilary and that he and his parents, who had moved in with Dr. Foretich, demonstrated an impressive love and concern for the child. *Id.* at 9, J.A. 276. Similarly, the court found that Dr. Morgan had "revealed a truly deep and abiding attachment to and love for her child," *id.* at 5, J.A. 272, and provided a "stable and nurturing" home for Hilary, *id.* at 6, J.A. 273. Dr. Morgan's only failure to act in Hilary's best interest, the court found, was her "intolerant attitude towards visitation and her unwillingness to allow the father any significant role in bringing up this child." *Id.* at 9, J.A. 276. In light of these findings, the court imposed its own schedule of unsupervised visitation for Dr. Foretich. *Id.* at 25-26, J.A. 292-93.

The first allegations of sexual abuse in this case arose just months after the Superior Court issued its custody and visitation order. *See Foretich*, slip op. at 1 n.1, J.A. 18; Am. Compl. ¶ 17, J.A. 106. Dr. Morgan first raised her accusations in January 1985 with a doctor at Children's Hospital in the District of Columbia and later raised them in legal proceedings before the D.C. Superior Court and the U.S. District Court for the Eastern District of Virginia. *See* Am. Compl. ¶ ¶ 18, 32, J.A. 106, 112. According to Dr. Morgan, Dr. Foretich and his parents repeatedly subjected Hilary to acts of sexual abuse of a most disturbing nature. *See* Am. Compl. ¶ 18, J.A. 106-08; Pls.' Mot. Summ. J. Ex. C , *reprinted in* J.A. 216-19. The allegations were graphic and shocking and described behavior that, if true, would subject the Foretichs to criminal liability under both D.C. and federal law. *See* D.C. Code § 22-3008 (2001); 18 U.S.C. §§ 2241-2248 (2000). Despite the Foretichs' strenuous denials, Dr. Morgan continued to press her claim that her daughter was the victim of horrific acts of abuse. Acting on her own beliefs, Dr. Morgan refused to produce Hilary for scheduled visits with Dr. Foretich and embarked instead on what proved to be a prolonged battle against both the Foretichs and the D.C.

Superior Court to block all contact between Hilary and her father.

From 1985 to 1987, the D.C. Superior Court issued several orders reinforcing its initial ruling that Dr. Foretich was entitled to visitation with Hilary. *See Morgan v. Foretich*, Civ. Action No. D-684-83 (D.C. Super. Ct. Aug. 19, 1987), *reprinted in* J.A. 239-44; *Morgan v. Foretich*, Civ. Action No. D-684-83 (D.C. Super. Ct. Aug. 15, 1986), *reprinted in* J.A. 221-34; *Morgan v. Foretich*, Civ. Action No. D-684-83 (D.C. Super. Ct. Dec. 27, 1985), *reprinted in* J.A. 246-52. Dr. Morgan remained intransigent. Although Dr. Foretich did have some contact with Hilary under the supervision of a court-appointed guardian *ad litem*, Dr. Morgan generally refused to cooperate with the court's visitation orders. The Superior Court consequently held Dr. Morgan in contempt of court on at least three occasions. *See Foretich*, slip op. at 2, J.A. 19.

Throughout this period, Dr. Morgan continued to charge Dr. Foretich and his parents with sexual abuse. However, none of her allegations ever resulted in any judicial finding of wrongdoing by the Foretichs. *See Foretich*, slip op. at 13 n.5, J.A. 30. Rather, the Superior Court repeatedly found Dr. Morgan unable to prove her charges. In November 1985, after a four-day hearing, the Superior Court determined that Dr. Morgan's allegations of sexual abuse were not proven and, therefore, did not warrant termination of Dr. Foretich's visitation rights. Am. Compl. ¶ 32, J.A. 112. One month later, the Superior Court reiterated that the results of medical evaluations of Hilary were "at most . . . inconclusive." *Morgan v. Foretich*, Civ. Action No. D-684-83, slip op. at 2 (D.C. Super. Ct. Dec. 27, 1985), *reprinted in* J.A. 247. In August 1986, the Superior Court again reaffirmed Dr. Foretich's visitation rights, finding that Dr. Morgan had "failed to show by a preponderance of the evidence that [Dr. Foretich] in any way sexually abused Hilary." *Morgan v. Foretich*, Civ. Action No. D-684-83, slip op. at 10 (D.C. Super. Ct. Aug. 15, 1986), *reprinted in* J.A. 226. One year later, in a similar judgment, the Superior Court once again declined to credit Dr. Morgan's charges of sexual abuse. *Morgan v. Foretich*,

Civ. Action No. D-684-83, slip op. at 3 (D.C. Super. Ct. Aug. 18, 1987), *reprinted in* J.A. 306.

In a related case, a jury in federal district court in Virginia rejected Dr. Morgan's claims of sexual abuse. *See Morgan v. Foretich*, 846 F.2d 941, 942 (4th Cir. 1988). Following an appeal to the U.S. Court of Appeals for the Fourth Circuit, the case was remanded to the district court because of the trial court's erroneous exclusion of certain evidence that had been offered by Dr. Morgan. *Id.* On remand, however, the case was dismissed after Dr. Morgan refused to comply with a discovery order. Am. Compl. ¶ 51, J.A. 118-19. In dismissing the case, the trial judge admonished Dr. Morgan for her "willful defiance" and "flagrant disregard" of court orders. *Id.* ¶ 51, J.A. 119.

There is no evidence that the Foretichs were ever the subjects of any criminal indictment or arrest warrant in connection with Dr. Morgan's allegations. Am. Compl. ¶ 22, J.A. 109-10. In its August 1987 order, the D.C. Superior Court succinctly captured the unfortunate state of affairs in the case:

> If [Dr. Morgan's] allegations of sexual abuse by [Dr. Foretich] of the minor child are true, then [Dr. Foretich] is a psychologically deranged child sex abuser. On the other hand, if [Dr. Foretich] is correct in his allegations that the child has been programmed by [Dr. Morgan] and that the allegations of sexual abuse are fabricated, then [Dr. Morgan] is a psychologically deranged and vindictive mother.

*Morgan v. Foretich*, Civ. Action No. D-684-83, slip op. at 2 (D.C. Super. Ct. Aug. 18, 1987), *reprinted in* J.A. 305.

Notwithstanding her failure to persuade any court of the truth of her allegations, Dr. Morgan stood fast. After two brief periods of incarceration in the D.C. Jail on charges of civil contempt, Dr. Morgan was ordered to jail a third time in August 1987 for her failure to produce Hilary for visitation or to reveal the child's whereabouts. *Morgan v. Foretich*, Civ.

Action No. D-684-83, slip op. at 2-3 (D.C. Super. Ct. Aug. 28, 1987) ("*Final Order*"), *reprinted in* J.A. 310-12. It later came to light that Dr. Morgan had sent five-year-old Hilary abroad with Dr. Morgan's parents, who ultimately took up residence in New Zealand with their granddaughter. *Foretich*, slip op. at 2, J.A. 19. Dr. Morgan remained incarcerated for 25 months. *Id.*

In the meantime, the Morgan-Foretich custody dispute had attracted extraordinary publicity. Dr. Morgan's resolve to keep Hilary from her father garnered the support of Congressman Frank Wolf. In April 1989, Congressman Wolf sponsored a bill that became the District of Columbia Civil Contempt Imprisonment Limitation Act of 1989. Pub. L. No. 101-97, 103 Stat. 633. Within days of the law's enactment in September 1989, Dr. Morgan was released from jail pursuant to this statute. In March 1990, Dr. Morgan secured the release of her passport from the D.C. Superior Court and joined her daughter in New Zealand. While there, Dr. Morgan successfully petitioned the New Zealand Family Court for sole custody of Hilary. *See Foretich*, slip op. at 2-3, J.A. 19-20.

In 1995, after spending five years in New Zealand, Dr. Morgan sought to return to the United States with her daughter. The August 1987 order of the Superior Court – mandating visitation for Dr. Foretich with Hilary – remained outstanding, however. That order required any law enforcement officer to take Hilary into custody and bring her to the Social Services Division of the Superior Court "to be placed in accordance with further order of the court." *Final Order*, slip op. at 3, J.A. 312. Dr. Morgan accordingly feared that returning to the United States would mean turning Hilary over to the Superior Court and, ultimately, to Dr. Foretich. Dr. Morgan's supporters in Congress intervened once more on her behalf. The Elizabeth Morgan Act was the product of that intervention.

Passed on September 30, 1996, as a legislative rider to the 1997 Department of Transportation Appropriations Act, the Elizabeth Morgan Act amended Title 11 of the D.C. Code to

restrict the authority of the D.C. Superior Court. The Act provides:

(a) In any pending case involving custody over a minor child or the visitation rights of a parent of a minor child in the Superior Court which is described in subsection (b) –

(1) at anytime after the child attains 13 years of age, the party to the case who is described in subsection (b)(1) may not have custody over, or visitation rights with, the child without the child's consent; and

(2) if any person had actual or legal custody over the child or offered safe refuge to the child while the case (or other actions relating to the case) was pending, the court may not deprive the person of custody or visitation rights over the child or otherwise impose sanctions on the person on the grounds that the person had such custody or offered such refuge.

(b) A case described in this subsection is a case in which –

(1) the child asserts that a party to the case has been sexually abusive with the child;

(2) the child has resided outside of the United States for not less than 24 consecutive months;

(3) any of the parties to the case has denied custody or visitation to another party in violation of an order of the court for not less than 24 consecutive months; and

(4) any of the parties to the case has lived outside of the District of Columbia during such period of denial of custody or visitation.

Department of Transportation and Related Agencies Appropriations Act of 1997, Pub. L. No. 104-205, § 350, 110 Stat. 2951, 2979 (1996) (codified at D.C. CODE § 11-925 (2001)). The Act undisputedly prohibits the Superior Court from awarding or enforcing custody or visitation rights to Dr.

Foretich without Hilary's consent and prevents the Superior Court from sanctioning Dr. Morgan on the basis of her previous custody of Hilary.

Members of Congress considered the proposed legislation in a subcommittee hearing in August 1995. *See H.R. 1855, To Amend Title 11, District of Columbia Code, To Restrict the Authority of the Superior Court Over Certain Pending Cases Involving Child Custody and Visitation Rights: Hearing Before the Subcomm. on the District of Columbia of the House Comm. on Gov't Reform & Oversight*, 104th Cong. (1995) ("*Hearing*"), *reprinted in* J.A. 34-96. According to the chairman of the subcommittee, the proposed bill would "permit Ellen Morgan to be and to feel free to return to the United States with no cloud of legal intervention over her head," and "reflect[ed] the common sense basic principle that the law ought not to compel one who has reached the age of reason into being forced to be unsupervised with someone whom that person asserts has been sexually abusive." *Hearing* at 2, J.A. 38 (statement of Rep. Davis). Although members of the subcommittee disclaimed retrying the case, the clear focus of the hearing was on the Morgan-Foretich custody dispute, and discussion during the hearing emphasized the need to vacate the orders of the D.C. Superior Court so that Dr. Morgan and Hilary would be free to return to the United States. *See Hearing* at 2-11, J.A. 38-42. Members also spoke of the need to "correct an injustice" and to protect Hilary's best interests by facilitating her "safe return" to the United States. *See id.*

The subcommittee heard testimony from Dr. Foretich, as well as from Dr. Morgan's mother and brother. Dr. Morgan and Hilary each submitted written statements expressing their desire to return to the United States without Hilary being forced to see her father. During Dr. Foretich's testimony, members of the subcommittee repeatedly attempted to broker a deal with him: If he would give up his parental rights and voluntarily seek vacatur of the Superior Court visitation orders, the subcommittee would withdraw the proposed legislation. *See Hearing* at 59-61, 65-67, 84, J.A. 66-67, 69-70, 79. No agreement could be reached, however, because

Dr. Foretich was unwilling to relinquish all of his parental rights.

Having failed to negotiate a deal with Dr. Foretich, Congress passed the Elizabeth Morgan Act on September 30, 1996. The Act was signed into law on October 2, 1996. Dr. Morgan successfully petitioned the New Zealand Family Court for permission to leave the country and, in May 1997, she returned to the United States with Hilary, who was by this time 14 years old. Dr. Foretich informed the Superior Court of their return and indicated his intent to seek enforcement of that court's prior orders. To that end, Dr. Foretich filed a motion in Superior Court in June 1997 to compel Dr. Morgan to disclose Hilary's location and to reappoint a guardian *ad litem*. Dr. Morgan opposed the motion on the grounds that the D.C. Superior Court lacked jurisdiction over the matter, in part because of the Elizabeth Morgan Act. *See* Am. Compl. ¶¶ 98-100, J.A. 137-38. No subsequent activity in the Superior Court appears on the record before us.

Dr. Foretich and his parents filed this suit on June 19, 1997, against the United States and the District of Columbia, seeking declaratory and injunctive relief. Dr. Foretich challenged the Elizabeth Morgan Act as an unconstitutional bill of attainder, a violation of his substantive and procedural due process rights, and a violation of separation of powers and D.C. home rule. Am. Compl. ¶¶ 109-34, J.A. 141-49. While Dr. Foretich's parents also participated as plaintiffs in the action before the District Court, the claims before us principally focus on injuries suffered by Dr. Foretich, so we will focus our discussion accordingly.

In addition to the negation of favorable Superior Court orders awarding visitation as well as costs and fees, Dr. Foretich alleged extraordinary injuries to his reputation resulting from the passage of the Act. Dr. Foretich elaborated on these injuries in an August 1997 affidavit in opposition to the United States' motion to dismiss. *See* Pl.'s Mem. Opp'n Def.'s Mot. Dismiss Ex. A. ("Foretich Aff."). Dr. Foretich described the subcommittee hearing on the Act as a "nightmare" and "the most humiliating experience of [his] life." *Id.*

¶¶ 5, 12. He stated that after passage of the Act he was continually harassed by the media and reminded by strangers that Congress considered him a danger to his daughter. *Id.* ¶¶ 18, 21. Dr. Foretich's neighbors also learned of the Act in a constituency mailing from Congressman Wolf. *Id.* ¶ 16.

The Act also damaged Dr. Foretich's professional reputation. Once a prominent oral surgeon, Dr. Foretich's business suffered a 30% decline following adoption of the Act. *Id.* ¶ 17. Forced to seek employment outside of northern Virginia, he was denied a position at a North Carolina university in part because of the Act. *Id.* ¶¶ 21-22. He further stated that he was asked to resign his position as Regent of the American College of Oral and Maxillofacial Surgeons on the grounds that "it would not be appropriate for an officer to serve after Congress had taken action finding that I had abused my daughter." *Id.* ¶ 23.

On October 1, 1997, the District Court granted Dr. Morgan's motion to intervene as a defendant. The District of Columbia subsequently realigned itself as a plaintiff in the case. All parties moved for summary judgment in August 1998. On June 13, 2002, the District Court denied the plaintiffs' motion and granted summary judgment to the United States and Dr. Morgan, rejecting each of Dr. Foretich's constitutional challenges. On July 10, 2002, Dr. Foretich filed a notice of appeal.

Dr. Morgan moved to dismiss the Foretichs' appeal as moot on the grounds that Hilary turned 18 in August 2000 and that the Superior Court therefore no longer has child custody jurisdiction over her. We ordered the parties to address the jurisdictional issue, in addition to the merits of the Foretichs' constitutional challenges.

## II. ANALYSIS

We review the District Court's grant of summary judgment *de novo*. *Levitan v. Ashcroft*, 281 F.3d 1313, 1317 (D.C. Cir. 2002) (citing *Summers v. Dep't of Justice*, 140 F.3d 1077, 1078 (D.C. Cir. 1998)). Applying this standard, we hold that the Elizabeth Morgan Act is an unconstitutional bill of attainder.

In light of this conclusion, we need not address appellants' other constitutional claims. Before deciding the merits, however, we assured ourselves of our jurisdiction over this appeal under Article III. We will first discuss the jurisdictional issue, then address the merits of the bill of attainder claim.

## A. Jurisdiction

Hilary Foretich turned 18 years old on August 21, 2000. For this reason, and because the child custody jurisdiction of the D.C. Superior Court extends only to minor children, appellees contend that Dr. Foretich's claim is moot insofar as it challenges the Act's negation of his visitation rights. We agree.

Appellees further contend that the Foretichs cannot maintain Article III standing with respect to any of their other alleged injuries, including harm to Dr. Foretich's personal and professional reputation. We reject this contention. Dr. Foretich's reputational injuries are sufficiently concrete and amenable to redress by a declaratory judgment in his favor as to satisfy the requirements of Article III standing. As the Supreme Court has made clear, the fact that one aspect of a lawsuit becomes moot does not automatically deprive a court of jurisdiction over remaining, live aspects of the case. *See, e.g., Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 121-22 (1974).

Article III of the Constitution limits our jurisdiction to "actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988). This limitation gives rise to the doctrines of standing and mootness. To satisfy Article III's standing requirements, a plaintiff must show that, at the time the suit is filed,

> (1) [he] has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). A plaintiff must maintain standing throughout the course of litigation. "If events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot." *McBryde v. Comm. to Review*, 264 F.3d 52, 55 (D.C. Cir. 2001), *cert. denied*, 537 U.S. 821 (2002).

Dr. Foretich alleges three principal injuries. First, he argues that the Elizabeth Morgan Act extinguishes visitation rights he previously enjoyed under the orders of the D.C. Superior Court and restricts his ability to seek future custody or visitation orders. This injury is premised on the requirement in subsection (a)(1) of the Act that Hilary give her consent before Dr. Foretich may have any visitation with her. Normally, under the "best interest" standard that generally applies in the District of Columbia, a judge considers the child's wishes as one factor in determining custody and visitation disputes, but the child's consent is not determinative. *See* D.C. CODE § 16-914(a)(3)(A) (2001). Dr. Foretich's visitation rights were thus changed by the Act in a way that adversely affected him as a parent, causing him to carry a burden that is not shouldered by other parents in the District of Columbia.

As appellees correctly contend, Dr. Foretich's challenge to this alleged injury is moot. The D.C. Superior Court's child custody jurisdiction extends only to minor children. *Creamer v. Creamer*, 482 A.2d 346, 350 (D.C. 1984); *see also* D.C. CODE § 46-101 (2001). Because Hilary Foretich reached the age of majority in August 2000, the Superior Court can no longer award any custody or visitation rights relating to her. Even in the absence of the Elizabeth Morgan Act, D.C. law thus precludes Dr. Foretich from obtaining or enforcing any visitation orders with respect to his daughter. Consequently, to the extent the Act infringed on Dr. Foretich's visitation rights, this injury is unredressable and cannot support a finding of jurisdiction.

Second, Dr. Foretich asserts that the Act prevents him from collecting fees and costs from Dr. Morgan that the D.C. Superior Court awarded to him prior to Dr. Morgan's flight to New Zealand. Dr. Foretich bases this alleged injury on subsection (a)(2) of the Act, which states that, where the Act applies, the Superior Court cannot "impose sanctions" on a person in Dr. Morgan's position on the grounds that she maintained custody of Hilary or otherwise gave her "safe refuge" while the custody suit was pending. D.C. CODE § 11-925(a)(2). Dr. Foretich cannot demonstrate a cognizable injury on this ground. Subsection (a)(2) prohibits the Superior Court from "impos[ing] sanctions" on Dr. Morgan. This language does not prevent Dr. Foretich from seeking enforcement of sanctions the court had *previously* imposed. Indeed, appellees conceded at oral argument before this court that the Act would not have this effect. Because we agree with this interpretation of the statute, and because the Government gave us its assurance at oral argument that it would not oppose collection of these previously awarded fees and costs, we conclude that Dr. Foretich does not have standing on the basis of this alleged injury.

In a similar vein, Dr. Foretich argues that the Act forecloses his ability to obtain new awards of fees and costs associated with Dr. Morgan's fleeing the jurisdiction. At first blush, this alleged injury appears better founded than appellants' first argument relating to fees and costs. It is not unreasonable to conclude, as the Government conceded at oral argument, that the Act's prohibition on "impos[ing] sanctions" precludes the Superior Court from entering any new orders awarding fees or costs against Dr. Morgan. Nevertheless, the claim is too speculative to satisfy Article III standing. Dr. Foretich points to no effort on his part to obtain any such costs, although it has been six years since Dr. Morgan returned to the United States. The mere prospect that Dr. Foretich may one day wish to press a claim for costs associated with Dr. Morgan's flight to New Zealand is too remote to impose an "actual or imminent" injury in fact, particularly where Dr. Foretich has given us no indication of

what such a claim might entail. We therefore cannot base a finding of jurisdiction upon this alleged injury.

Dr. Foretich's third and final claim rests on his contention that he suffered extraordinary injuries to his personal and professional reputations as a result of the Act. In particular, he asserts that the Elizabeth Morgan Act embodies a congressional determination that he engaged in criminal acts of child abuse from which his daughter needed protection. As Dr. Foretich detailed in the unrefuted affidavit submitted to the District Court, passage of the Act led to harassment by the media, estrangement from his neighbors, and loss of business and professional opportunities. *See* Foretich Aff. ¶ ¶ 16-18, 21-23. According to Dr. Foretich, these reputational harms resulted directly from the congressional determination that he had abused his daughter. *Id.* ¶ 23. These injuries are both cognizable and redressable and therefore satisfy the requirements of Article III.

Appellees concede, as they must, that injury to reputation can constitute a cognizable injury sufficient for Article III standing. *See Meese v. Keene*, 481 U.S. 465, 473-77 (1987); *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 140-41 (1951) (opinion of Burton, J.); *McBryde*, 264 F.3d at 57; *S. Mut. Help Ass'n v. Califano*, 574 F.2d 518, 524 (D.C. Cir. 1977). Furthermore, there can be no serious doubt that Dr. Foretich suffered harm to his reputation as a result of this Act and its attendant publicity. Dr. Foretich's affidavit to that effect was not contradicted. There are two components of Dr. Foretich's reputational injury that must be distinguished, however, as only one permits a finding of Article III standing.

First, Dr. Foretich's reputation arguably was harmed by the vitiation of his custodial rights. When a government entity abrogates an individual's parental rights on the basis of a judgment that the person is unfit as a parent, the official abrogation undoubtedly damages that person's reputation and standing in the community. Accordingly, some portion of the harm to Dr. Foretich's reputation plausibly derives from the Act's effect on his visitation rights. As noted above, however,

to the extent that the Act infringes upon Dr. Foretich's parental rights, this infringement is not redressable. Even if we invalidated the Act, D.C. law would still preclude Dr. Foretich from obtaining or enforcing any visitation orders in Superior Court in light of Hilary's age. Accordingly, this component of Dr. Foretich's reputational injury is merely the secondary effect of an injury that is otherwise moot.

Our case law makes clear that where reputational injury is the lingering effect of an otherwise moot aspect of a lawsuit, no meaningful relief is possible and the injury cannot satisfy the requirements of Article III. *See McBryde*, 264 F.3d at 57. In *McBryde*, a federal district judge challenged various sanctions imposed against him for misconduct by the Judicial Council for the Fifth Circuit, including suspensions from new case assignments. *Id*. at 54-55. The suspensions had expired by the time we heard the appeal. *Id.* at 55. Among his alleged injuries, the appellant asserted harm to his reputation. We held that the reputational injury alone did not support the appellant's standing to challenge the suspensions. Rather, "when injury to reputation is alleged as a secondary effect of an otherwise moot action, we have required that 'some tangible, concrete effect' remain, susceptible to judicial correction." *Id.* at 57 (quoting *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1019 (D.C. Cir. 1991)).

Similarly, in *Penthouse International, Ltd. v. Meese*, we expressed skepticism that the continuing reputational injury caused by a government letter that labeled appellant's publication as pornography and discouraged retailers from selling it could, by itself, keep the controversy alive after the Government had retracted the letter. 939 F.2d 1011, 1018-19 (D.C. Cir. 1991), *cert. denied*, 503 U.S. 950 (1992). Because the reputational injury in that case was the lingering effect of an otherwise moot action, we distinguished cases in which the reputational injury was the "direct effect of the legal action the government had taken," *id.* at 1019 (distinguishing *Reeve Aleutian Airways, Inc. v. United States*, 889 F.2d 1139, 1143 (D.C. Cir. 1989)), or where the incremental reputational harm was accompanied by more concrete injuries, *id.* (distinguishing *Am. Fed'n of Gov't Employees v. Reagan*, 870 F.2d 723,

726 (D.C. Cir. 1989); *Doe v. United States Air Force*, 812 F.2d 738, 740-41 (D.C. Cir. 1987)). Likewise, in *Aulenback, Inc. v. FHA*, 103 F.3d 156 (D.C. Cir. 1997), we held that a continuing reputational injury did not confer standing to seek declaratory relief when that injury derived from charges of misconduct that had been rendered moot by consent decree. *Id*. at 163.

These cases illustrate that where harm to reputation arises as a byproduct of government action, the reputational injury, without more, will not satisfy Article III standing *when that government action itself no longer presents an ongoing controversy*. Because the cause of the reputational harm is an otherwise moot government action, a judicial declaration that the action was unlawful is not likely to provide any further relief beyond that resulting from the expiration of the action itself. For this reason, we stated in *McBryde* that, because the appellant's reputational injuries derived from suspensions that had already expired, "[w]e cannot see how [a declaratory judgment that the suspensions were unlawful] would rehabilitate his reputation." 264 F.3d at 57. Similarly, we held in *Penthouse* that if the retraction of the letter that was the source of the appellant's reputational injuries had not relieved those injuries, we saw no reason why "a declaratory judgment would be likely to do so." 939 F.2d at 1019; *see also Aulenback*, 103 F.3d at 163 (noting that appellants "offer[ed] no reason why, if the rescission of the [government action] . . . did not bring back their customers, a declaratory judgment would be likely to do so"). Accordingly, to the extent that the injuries to Dr. Foretich's reputation derive from the Act's abrogation of his visitation rights, these injuries constitute the lingering effect of an otherwise moot government action and cannot be the basis for Article III standing.

Dr. Foretich does not limit his alleged reputational injury in this manner, however. There is a large second component to his reputational injury that constitutes an ongoing controversy and consequently supports our jurisdiction. As Dr. Foretich's uncontroverted affidavit makes clear, his principal complaint is that the Elizabeth Morgan Act harmed his reputation by embodying a congressional determination that

he is a child abuser and a danger to his own daughter. This claim clearly gives Dr. Foretich standing in this case. Congress's act of judging Dr. Foretich and legislating against him on the basis of that judgment – the very things that, as we will see, render the Act an unconstitutional bill of attainder – directly give rise to a cognizable injury to his reputation that can be redressed by a declaratory judgment in Dr. Foretich's favor.

Case law is clear that where reputational injury derives directly from an unexpired and unretracted government action, that injury satisfies the requirements of Article III standing to challenge that action. In *Meese v. Keene*, the Supreme Court held that the appellee had standing, on the basis of injuries to his personal and professional reputation, to challenge a federal statute classifying films the appellee wished to exhibit as "political propaganda." 481 U.S. 465, 472-77 (1987). Finding that the injury to the appellee's reputation "occurs because the Department of Justice has placed the legitimate force of its criminal enforcement powers behind the label of 'political propaganda,'" the Court held that the alleged injury was likely to be redressed by a favorable decision declaring the Act unconstitutional and enjoining its application to the appellee. *Id.* at 477.

In *McBryde*, we relied on *Keene* to uphold the appellee's standing to challenge a public reprimand issued by the Judicial Council rebuking the appellee for his misconduct. 264 F.3d at 56-57. Unlike the suspensions, which had expired and therefore could not be challenged on the basis of reputational injury, "[t]he dispute over the public reprimand . . . remain[ed] alive." *Id.* at 56. The reprimand constituted an "official characterization" of the appellee as having engaged in "a pattern of abusive behavior" that was "prejudicial to the effective and expeditious administration of the business of the courts," and therefore inflicted direct injury to his reputation. *Id.* at 57. Consequently, we held that if the appellant prevailed on the merits, "it would be within our power to declare unlawful the defendants' issuance of stigmatizing reports and thereby to relieve [the appellant] of much of the resulting injury." *Id.*; *cf. Sullivan v. Comm. on Admissions*, 395 F.2d

954, 956 (D.C. Cir. 1968) (holding that an attorney charged with misconduct had standing on the basis of reputational injury to appeal those portions of the district court's opinion that reflected unfavorably on the attorney's professional conduct even though the district court had otherwise dismissed the charges).

As these cases demonstrate, reputational injury that derives directly from government action will support Article III standing to challenge that action. Redress is possible in such a case because the damage to reputation is caused by the challenged action. A declaratory judgment that the government's actions were unlawful will consequently provide meaningful relief. *See Keene*, 481 U.S. at 477; *McBryde*, 264 F.3d at 57. In this case, as in *Keene* and *McBryde*, Dr. Foretich contends that the cited government action, here the Elizabeth Morgan Act, directly damages his reputation and standing in the community by effectively branding him a child abuser and an unfit parent. This is sufficient to satisfy the requirements of Article III. This alleged injury to Dr. Foretich's reputation is a concrete and direct result of the legislation. A judicial determination that Congress acted unlawfully in enacting the Elizabeth Morgan Act will provide a significant measure of redress for the harm to Dr. Foretich's reputation. This alleged injury therefore supports a finding of jurisdiction in this case.

Our conclusion might be different if the Government had repealed the Elizabeth Morgan Act. Even where a government action embodies a characterization or condemnation that damages an individual's standing in the community, the resulting reputational injury would not satisfy Article III standing if the challenged action had been rescinded and if the Government satisfied its burden of demonstrating "that 'there is no reasonable expectation . . .' that the alleged violation will recur." *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 492 (D.C. Cir. 1988) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). Thus, as noted above, the "lingering effects" on reputation of a retracted or repealed government action normally do not furnish a basis for Article III standing. *Compare Keene*, 481 U.S. at 476-77 (official

condemnation was a continuing threat), *and McBryde*, 264 F.3d at 56-57 (stigmatizing reports were a continuing part of the historical record), *with Penthouse*, 939 F.2d at 1018-19 (letter accusing retailers of distributing pornography had been retracted). This is not such a case. The Elizabeth Morgan Act remains in force. We therefore retain jurisdiction over Dr. Foretich's challenge to its constitutionality.

The Government argues that Dr. Foretich lacks standing to sue on the basis of reputational injury because, even under our reading of *Keene* and *McBryde*, his injuries are not redressable. Specifically, the Government contends that any adverse impact on Dr. Foretich's reputation derives not from the existence of the Elizabeth Morgan Act, but from the legislative process and surrounding publicity that led to its enactment. Although the Government conceded at oral argument that the legislative process had an adverse "impact on appellant's reputation," it was unwilling to attribute that impact to the statute itself. Instead the Government asserted that the statute does not reflect anything "on its face" about the Foretichs. Thus, the Government argues that a decision from this court declaring the Act to be unconstitutional cannot redress Dr. Foretich's reputational injuries. In support of this argument, the Government attempts to distinguish the public reprimand at issue in *McBryde* on the ground that express condemnations of the appellant in that case appeared on the face of the challenged reprimand. *See* 264 F.3d at 56-57.

We reject the Government's argument. It makes little sense to view the Act in isolation, divorced from the legislative process that produced it. The statute represents the culmination of that process, and it memorializes judgments about Dr. Foretich that Congress formed during the course of that process. The Government's argument is particularly tenuous in the context of a bill of attainder challenge, in which the alleged constitutional defect arises not only from the statute's text, but also from the underlying process of legislatively determining guilt without the protections of a judicial trial. *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977). It is therefore not plausible to suggest that

the Elizabeth Morgan Act itself does not contribute to the harm suffered by Dr. Foretich's reputation.

Furthermore, contrary to the Government's objections, a declaration by this court that Congress exceeded its constitutional bounds by enacting the Elizabeth Morgan Act will provide relief for Dr. Foretich and his parents. *See McBryde*, 264 F.3d at 57 ("Were [the plaintiff] to prevail on the merits it would be within our power to declare unlawful the defendants' issuance of stigmatizing reports *and thereby to relieve* . . . much of the resulting injury.") (emphasis added); *Doe*, 812 F.2d at 740 ("We think that a declaratory judgment that the materials and information were obtained [from the plaintiff] by violating the Constitution would constitute relief."); *S. Mut. Help Ass'n*, 574 F.2d at 524 (finding the plaintiff's assertion "that its good name and reputation have been damaged" to be an injury "capable of direct redress" through the requested declaratory and injunctive relief). Such a declaration will remove the imprimatur of government authority from an Act that effectively denounces Dr. Foretich as a danger to his own daughter.

In *Keene*, the Attorney General argued that enjoining the Government from labeling appellant's films as "political propaganda" would not provide relief because, even if the designation was removed, members of the community might continue to react negatively to the appellant and his films because of their having once been labeled. 481 U.S. at 476-77. Notwithstanding this possibility, the Supreme Court concluded that the injunction would at least partially redress the plaintiff's reputational injury, because it would remove "the *legitimate force* of [the Government's] criminal enforcement powers" from the label. *Id.* at 477 (emphasis added).

In other areas of the law, courts have proceeded on the assumption that a favorable judicial decision will provide meaningful relief – even if not complete – to a party who alleges an injury to his or her reputation. Our circuit has joined others, for example, in finding that an attorney charged with misconduct has standing on the basis of reputational injury to appeal a judgment finding the attorney guilty

but refraining from imposing any concrete sanctions. *See Sullivan*, 395 F.2d at 956; *see also Walker v. City of Mesquite*, 129 F.3d 831, 832 (5th Cir. 1997). Similarly, it is foundational to the law of libel and defamation that a party who prevails on a claim that the defendant's tort has harmed his or her reputation is in some sense relieved by that judgment. *See, e.g.*, *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 515 (1991) ("[T]he tort action for defamation has existed to redress injury to the plaintiff's reputation by a statement that is defamatory and false."); *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990) (noting that "a defamation tort redresses damage to reputation").

It may be true, as the Government argues, that the damage to Dr. Foretich's reputation comes in part from the publicity surrounding the custody dispute and Dr. Morgan's allegations, not solely from the Elizabeth Morgan Act. But this misses the point. The Act itself has caused significant harm to Dr. Foretich. Therefore, by vindicating Dr. Foretich's assertion that Congress unfairly and unlawfully rendered a judgment as to his character and fitness as a father, declaratory relief will provide a significant measure of redress sufficient to satisfy the requirements of Article III standing. Here, a decision declaring the Act unlawful would make clear that Congress was wrong to pass judgment on Dr. Foretich and wrong to single him out for punishment on the basis of that judgment. In doing so, a declaratory judgment in Dr. Foretich's favor would give redress for his reputational injuries.

As a final matter, appellees invite us to exercise our discretion under the doctrine of prudential mootness to refrain from hearing this appeal. We decline to do so. Because the exercise of our equitable powers is discretionary, we may decline to hear an appeal for declaratory or injunctive relief "[w]here it is . . . unlikely that the court's grant of declaratory judgment will actually relieve the injury." *Penthouse*, 939 F.2d at 1019. This is especially true where the court can avoid adjudication of difficult or novel constitutional questions. *Id.* at 1020. These conditions do not obtain in this case. As we have said, a favorable judgment for appellants

will provide a real measure of redress to Dr. Foretich. Moreover, this case does not raise unusually complex questions of law. Rather, appellants' claims implicate a constitutional provision with respect to which case law provides ample interpretive guidance. Accordingly, we proceed to review the merits of those claims.

## B. Bill of Attainder

Dr. Foretich argues that the Elizabeth Morgan Act violates the Bill of Attainder Clause by singling him out for legislative punishment. We agree and hold the Act to be an unconstitutional bill of attainder.

Article I, section 9 of the Constitution provides that "[n]o Bill of Attainder . . . shall be passed." U.S. CONST. art. I, § 9, cl. 3. This provision prohibits Congress from enacting "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977). As the Supreme Court explained in *United States v. Brown*, 381 U.S. 437 (1965), the Clause was intended to serve as "a general safeguard against legislative exercise of the judicial function, or more simply – trial by legislature." *Id.* at 442. The infrequency with which courts have relied upon this provision to invalidate legislation has not prevented its meaning from evolving to fulfill this purpose. *See BellSouth Corp. v. FCC*, 162 F.3d 678, 683 (D.C. Cir. 1998) ("*BellSouth II*").

Early in our country's history, a bill of attainder was seen to refer to a legislative act that sentenced a named individual to death without benefit of a judicial trial. *See BellSouth Corp. v. FCC*, 144 F.3d 58, 62 (D.C. Cir. 1998), *cert. denied*, 526 U.S. 1086 (1999) ("*BellSouth I*"). As early as 1810, however, the scope of the prohibition was extended to include so-called "bills of pains and penalties," or legislative acts that sentenced specified persons to penalties short of death, including banishment, deprivation of the right to vote, corruption of blood, or confiscation of property. *See Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 138 (1810); *see also Brown*, 381 U.S. at 441-42; *BellSouth I*, 144 F.3d at 62. By 1866, the

Supreme Court wrote that a forbidden attainder could embrace "[t]he deprivation of any rights, civil or political, previously enjoyed," if the attending circumstances and causes of the deprivation demonstrated that the deprivation amounted to "punishment." *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 320 (1866). Decisions from the Supreme Court since the Civil War have invalidated as bills of attainder legislation barring specified persons or groups from pursuing various professions, where the employment bans were imposed as a brand of disloyalty. *Nixon*, 433 U.S. at 474-75.

Under the now prevailing case law, a law is prohibited under the bill of attainder clause "if it (1) applies with specificity, and (2) imposes punishment." *BellSouth II*, 162 F.3d at 683. The element of specificity may be satisfied if the statute singles out a person or class by name *or* applies to "easily ascertainable members of a group." *United States v. Lovett*, 328 U.S. 303, 315 (1946). As the Supreme Court made clear in *Nixon*, however, specificity alone does not render a statute an unconstitutional bill of attainder. *See* 433 U.S. at 469-73. Rather, a law may be so specific as to create a "legitimate class of one" without amounting to a bill of attainder unless it also satisfies the "punishment" element of the analysis. *Id.* at 472. For this reason, we have upheld statutes against bill of attainder challenges even where the disputed statutes applied to specifically named parties. *See BellSouth II*, 162 F.3d at 684; *BellSouth I*, 144 F.3d at 63. Both "specificity" and "punishment" must be shown before a law is condemned as a bill of attainder.

In this case, there can be no serious dispute that the Elizabeth Morgan Act satisfies the specificity prong of our analysis. Although Congress stopped short of including the names "Foretich" and "Morgan" in the text of the statute, the applicability of the Act depends on such a narrow set of circumstances that it applies to no known cases other than the Morgan-Foretich custody dispute. The statute does not apply unless: (1) the minor child in a pending custody case has attained 13 years of age; (2) the child has resided outside of the United States for not less than 24 consecutive months; (3) any party to the case has denied custody or visitation to

another party in violation of a court order for not less than 24 consecutive months;  (4) any party to the case has lived outside of the District of Columbia during that period of denial of custody or visitation;  and (5) the child has asserted that a party to the case has been sexually abusive with him or her.  D.C. CODE § 11-925.  This combination of facts is so exceedingly narrow and unlikely to coincide that the affected persons are indeed "easily ascertainable."  For this reason, the Government conceded at oral argument that there was no genuine issue as to the law's specificity, stating that "there's no question that this law was specific to this family."

While the Elizabeth Morgan Act thus satisfies the specificity requirement, this is only the beginning of our inquiry. Recognizing that "virtually all legislation operates by identifying the characteristics of the class to be benefited or burdened," we stated in *BellSouth I* that "it is not clear that the specificity requirement retains any real bite."  144 F.3d at 63. Rather, the principal touchstone of a bill of attainder is punishment.

To ascertain whether a statute imposes punishment, the Supreme Court has instructed that a court should pursue a three-part inquiry:

> (1) whether the challenged statute falls within the historical meaning of legislative punishment;  (2) whether the statute, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes"; and (3) whether the legislative record "evinces a congressional intent to punish."

*Selective Serv. Sys. v. Minn. Pub. Interest Research Group*, 468 U.S. 841, 852 (1984) (quoting *Nixon*, 433 U.S. at 473, 475-76, 478).  The Court has applied each of these criteria as an independent – though not necessarily decisive – indicator of punitiveness.  *See Selective Serv. Sys.*, 468 U.S. at 852-56; *Nixon*, 433 U.S. at 473-84;  *see also SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 673 (9th Cir. 2002) ("[W]e weigh these factors together in resolving a bill of attainder claim.");  *Consol. Edison Co. v. Pataki*, 292 F.3d

338, 350 (2d Cir.), *cert. denied*, 537 U.S. 1045 (2002) ("[A] statute need not fit all three factors to be considered a bill of attainder; rather, those factors are the evidence that is weighed together in resolving a bill of attainder claim.").

Our cases have noted, however, that the second factor – the so-called "functional test" – "invariably appears to be 'the most important of the three.'" *BellSouth II*, 162 F.3d at 684 (quoting *BellSouth I*, 144 F.3d at 65). Indeed, compelling proof on this score may be determinative. In *BellSouth I*, we explained that where an enactment falls outside the historical definition of punishment, therefore failing to satisfy the first test, the legislation may still be a bill of attainder under the functional test if no legitimate nonpunitive purpose appears. 144 F.3d at 65. This ensures that Congress cannot "circumvent[ ] the clause by cooking up newfangled ways to punish disfavored individuals or groups." *Id.*

### 1. The Historical Test

With these principles in mind, we begin by examining whether the Elizabeth Morgan Act imposes a burden that falls within the historical meaning of legislative punishment. *Selective Serv. Sys.*, 468 U.S. at 852; *see also Nixon*, 433 U.S. at 473 ("The infamous history of bills of attainder is a useful starting point in the inquiry whether the Act fairly can be characterized as a form of punishment . . . ."). The historical experience with bills of attainder in England and the United States "offers a ready checklist of deprivations and disabilities so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably have been held to fall within the proscription of Art. I, § 9." *Nixon*, 433 U.S. at 473. This checklist includes sentences of death, bills of pains and penalties, and legislative bars to participation in specified employments or professions. *See BellSouth II*, 162 F.3d at 685.

We agree with the Government that the Elizabeth Morgan Act does not obviously impose burdens that historically have been identified as punishment. In other words, there are no past cases that involve the precise situation that we face here, so history is not conclusive. Appellants rely on dictum in

*Cummings v. Missouri* to the effect that "[d]isqualification from the pursuits of a lawful avocation, or from positions of trust, or from the privilege of appearing in the courts, or acting as an executor, administrator, or guardian, may also, and often has been, imposed as punishment," 71 U.S. (4 Wall.) at 320, arguing that "guardian" and "parent" are equivalent. This is a stretch. *Cummings* addressed a requirement imposed by the Missouri State Constitution that certain persons take an oath of loyalty before entering into certain professions. *Id.* at 279-81. Thus, at least at first blush, the reference to "guardian" does not appear to implicate parental child custody arrangements.

Although the particular burden imposed on Dr. Foretich under the Act is not precisely identical to any of the burdens historically recognized as punishment, the Elizabeth Morgan Act is not entirely incongruous with historical notions of punishment. First, it is noteworthy that, in past cases, in assessing whether a statute is a bill of attainder, the Court has looked to determine whether there is a rational connection between the restriction imposed and a legitimate nonpunitive purpose. For example, in *Dent v. West Virginia*, 129 U.S. 114 (1889), the Court upheld a law imposing certain educational and certification requirements on individuals before they could practice medicine. The Court found that such restrictions did not amount to a bill of attainder because they were appropriately related to the medical profession and therefore constituted a reasonable means of ensuring the public safety. *Id.* at 122-23. The Court distinguished the statutes invalidated as bills of attainder in *Cummings* and *Ex Parte Garland* on the ground that the loyalty oaths at issue in those cases bore "no relation" to the restricted individuals' "fitness for the pursuits and professions designated." *Id.* at 125-26 (discussing *Cummings*, 71 U.S. (4 Wall.) 277 (1866); *Ex Parte Garland*, 71 U.S. (4 Wall.) 333 (1866)). These early decisions foreshadowed the development of the functional test and reinforce the necessity of a coherent and reasonable nexus between the burden imposed and the benefit to be gained. *See Nixon*, 433 U.S. at 473 (describing historically recognized bills of attainder as "deprivations and disabilities

*so disproportionately severe and so inappropriate to nonpunitive ends* that they unquestionably have been held to fall within the proscription of Art. I, § 9") (emphasis added).

Second, the early cases also demonstrate that a statute will be particularly susceptible to invalidation as a bill of attainder where its effect is to mark specified persons with a brand of infamy or disloyalty. *See id.* at 474 (noting that laws barring designated individuals from participation in specified professions were "a mode of punishment commonly employed against those legislatively branded as disloyal"). Borrowing from Blackstone, the Fifth Circuit recently discussed the common law concept of attainder – limited to sentences of death – in terms of the ignominy such laws imposed:

> "When sentence of death, the most terrible and highest judgment in the laws of England, is pronounced, the immediate inseparable consequence by the common law is *attainder*. For when it is now clear beyond all dispute, that the criminal is no longer fit to live upon the earth, but is to be exterminated as a monster and a bane to human society, the law sets a note of infamy upon him, puts him out of it's [sic] protection, and takes no farther care of him than barely to see him executed. He is then called attaint, *attinctus*, stained, or blackened. He is no longer of any credit or reputation. . . ."

*SBC Communications, Inc. v. FCC*, 154 F.3d 226, 235 (5th Cir. 1998) (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES *380). While the prohibition against bills of attainder has evolved far beyond the original context of capital sentences, it continues to focus on legislative enactments that "set[ ] a note of infamy" on the persons to whom the statute applies. *See Brown*, 381 U.S. at 453-54 (holding that a statute is not a bill of attainder where it "incorporates no *judgment censuring or condemning* any man or group of men") (emphasis added).

Viewed in this light, the Elizabeth Morgan Act, while not squarely within the historical meaning of legislative punishment, is not dissimilar to the types of burdens traditionally recognized as punitive. As our discussion of Dr. Foretich's standing to pursue this lawsuit makes clear, one effect of the

Act has been that Dr. Foretich is "no longer of any credit or reputation." If anything, the burdens imposed on Dr. Foretich under the Act – deprivation of parental rights and the opprobrium of being branded a criminal child abuser – may be of even greater magnitude than many of those at issue in the historical cases. If deprivation of the right to hold office in a labor union, *see Brown*, 381 U.S. at 458-60, or to practice a certain profession, *see Lovett*, 328 U.S. at 316, can constitute punishment, surely deprivation of Dr. Foretich's right to be with his own daughter on the basis of a legislative determination of criminal sexual abuse also qualifies for that description. A finding that the Act constitutes a bill of attainder therefore would not be an inconsistent extension of the historical category.

In any event, even if the Act does not fall precisely within the historical meaning of punishment, this conclusion would not preclude a finding that the Act constitutes an unconstitutional bill of attainder. Case law makes clear that "our inquiry is not ended by the determination that the Act imposes no punishment traditionally judged to be prohibited by the Bill of Attainder Clause." *Nixon*, 433 U.S. at 475. Were this not the case, "new burdens and deprivations might be legislatively fashioned that are inconsistent with the bill of attainder guarantee." *Id.* For this reason, the category of "bills of attainder" has continued to evolve and expand. *See BellSouth II*, 162 F.3d at 683. We therefore proceed to apply the other criteria for legislative punishment to determine whether the Act constitutes an impermissible bill of attainder. *See Selective Serv. Sys.*, 468 U.S. at 853-54 ("To ensure that the Legislature has not created an impermissible penalty not previously held to be within the proscription against bills of attainder, we must determine whether the challenged statute can be reasonably said to further nonpunitive goals.").

*2. The Functional Test*

Under the second prong of the bill of attainder analysis, we must consider "whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes."

*Nixon*, 433 U.S. at 475-76. "Where such legitimate legislative purposes do not appear, it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decisionmakers." *Id*. at 476. Under this functional test, the nonpunitive aims must be "sufficiently clear and convincing" before a court will uphold a disputed statute against a bill of attainder challenge. *BellSouth II*, 162 F.3d at 686.

Courts have conducted this inquiry by examining both the purported ends of contested legislation and the means employed to achieve those ends. In *Nixon*, the Supreme Court rejected a bill of attainder challenge to an act directing the Administrator of General Services to take custody of the presidential papers and tape recordings of former President Nixon. 433 U.S. at 429. The Court found the objectives of the act, which included the need to preserve information necessary to the completion of Watergate-related prosecutions and the desire to safeguard documents of historical significance, to be "legitimate justifications" for its passage, *id.* at 476, that did not "support[ ] an implication of a legislative policy designed to inflict punishment on an individual." *Id*. at 478. In addition, the Court noted aspects of the statute designed to protect the rights of the burdened party. *Id.* at 477. The Court therefore found the act to be a "fair exercise of Congress' responsibility." *Id.*

More recently, in *Selective Service System*, the Court examined the constitutionality of a statute denying federal financial aid to male students who failed to register for the draft. 468 U.S. at 843. The Court first noted that the statute served the nonpunitive legislative goal of encouraging those required to register to do so. *Id*. at 854. The Court further examined whether the means employed in the statute – conditioning the receipt of federal aid on registration – was a "rational means" of achieving the goal. *Id*. "Since the group of young men who must register for the draft overlaps in large part with the group of students who are eligible for [federal] aid," the Court found, "Congress reasonably concluded that [the statute] would be a strong tonic to many nonregistrants." *Id*. The Court also found the scope of the

legislation to be relevant under the functional test. *Id*. at 855. That the statute applied equally to unintentional violators, rather than "singl[ing] out intentional nonregistrants," evinced the statute's "nonpunitive spirit." *Id*.

Our own cases have emphasized the need for a legitimate nonpunitive purpose and a rational connection between the burden imposed and nonpunitive purposes of the legislation. In *BellSouth II*, we found that the challenged portion of the Telecommunications Act of 1996 did not inflict punishment because it was a rational means of serving a fair and legitimate nonpunitive purpose. *See* 162 F.3d at 686-90 (citing cases indicating the need for a meaningful nexus between the restriction imposed and the legitimate government purpose). We further noted that "the differential treatment" of the parties specified in the Act was "neither suggestive of punitive purpose nor particularly suspicious." *Id*. at 690; *see also BellSouth I*, 144 F.3d at 67 (finding other portions of the Telecommunications Act to serve rational and nonpunitive purposes and that the selectivity of the Act was "quite understandable without resort to inferences of punitive purpose").

By contrast, other cases make clear that where there exists a significant imbalance between the magnitude of the burden imposed and a purported nonpunitive purpose, the statute cannot reasonably be said to further nonpunitive purposes. *See Consol. Edison Co.*, 292 F.3d at 354 (holding a statute to be a bill of attainder where "the legislature piled on a burden that was obviously disproportionate to the harm caused").

Because such an imbalance belies any purported nonpunitive goals, the availability of "less burdensome alternatives" becomes relevant to the bill of attainder analysis. *See Nixon*, 433 U.S. at 482 ("In determining whether a legislature sought to inflict punishment on an individual, it is often useful to inquire into the existence of less burdensome alternatives by which that legislature . . . could have achieved its legitimate nonpunitive objectives."); *SeaRiver*, 309 F.3d at 677-78 (considering whether there existed any less burdensome alternatives by which the legislature could have achieved its pur-

pose); *Consol. Edison Co.*, 292 F.3d at 354 (noting that there were plainly less burdensome alternatives to the law enacted where the legislature "made no attempt whatsoever to ensure that the costs imposed on Con Ed were proportional to the problems that the legislature could legitimately seek to ameliorate").

Certain principles emerge from these cases. First, to avoid designation as a bill of attainder, a statute that burdens a particular person or class of persons must serve purposes that are not only nonpunitive, but also rational and fair. *See Selective Serv. Sys.*, 468 U.S. at 854; *Nixon*, 433 U.S. at 483; *BellSouth II*, 162 F.3d at 680, 686-88. In addition, as the historical cases foreshadowed, there must be a nexus between the legislative means and legitimate nonpunitive ends. *See Selective Serv. Sys.*, 468 U.S. at 854; *BellSouth II*, 162 F.3d at 687-88. Additionally, a court must weigh the purported nonpunitive purpose of a statute against the magnitude of the burden it inflicts. *See Nixon*, 433 U.S. at 475-76 (stating that the question under the functional test is "whether the law under challenge, *viewed in terms of the type and severity of burdens imposed*, reasonably can be said to further nonpunitive legislative purposes") (emphasis added). It is not the severity of a statutory burden in absolute terms that demonstrates punitiveness so much as the magnitude of the burden relative to the purported nonpunitive purposes of the statute. A grave imbalance or disproportion between the burden and the purported nonpunitive purpose suggests punitiveness, even where the statute bears some minimal relation to nonpunitive ends. *See id.* at 473; *Consol. Edison Co.*, 292 F.3d at 354.

Other aspects of a challenged statute also bear on the bill of attainder analysis. For example, the inclusion of protective measures designed to safeguard the rights of the burdened individual or class weighs against a finding that a statute is a bill of attainder. *See Nixon*, 433 U.S. at 477. Moreover, the selectivity or scope of a statute may indicate punitiveness where the differential treatment of the affected party or parties cannot be explained "without resort to inferences of punitive purpose." *BellSouth I*, 144 F.3d at 67; *see*

*also Navegar, Inc. v. United States*, 192 F.3d 1050, 1067 (D.C. Cir. 1999), *cert. denied*, 531 U.S. 816 (2000) (holding that the breadth of a challenged statute indicated that Congress "was aiming not to punish appellants, but rather to regulate an entire class"); *BellSouth II*, 162 F.3d at 690. Finally, the availability of less burdensome alternatives can also cast doubt on purported nonpunitive purposes. *See Nixon*, 433 U.S. at 482; *SeaRiver*, 309 F.3d at 677-78; *Consol. Edison Co.*, 292 F.3d at 354. To be sure, these considerations are not alone decisive, and Congress must have sufficient latitude to choose among competing policy alternatives so that our bill of attainder analysis will not "cripple the very process of legislating." *Nixon*, 433 U.S. at 470. Nevertheless, the presence in a challenged enactment of the features highlighted in these cases undercuts the plausibility of any purported benign purposes and points us toward a finding of punitiveness.

Applying these principles to the instant case, we conclude that the Elizabeth Morgan Act constitutes "punishment" under the functional test. As an initial matter, there can be no doubt as to the magnitude of the burden the Act imposes on Dr. Foretich. By singling out Dr. Foretich as virtually the only parent subject to the Act, Congress has permanently associated him with criminal acts of child sexual abuse. The Act memorializes a judgment by the United States Congress that Dr. Foretich is guilty of horrific crimes. Congress reached this determination despite the repeated and unwavering rejection of such claims by every court that considered them. As a result, the Act inflicts significant and costly injury to Dr. Foretich's reputation, while it also takes a significant step toward permanently severing Dr. Foretich's relationship with his own daughter.

The Government argues that the Act serves the nonpunitive purposes of promoting the best interests of the child, reuniting a family, and facilitating the return of U.S. citizens to this country. In the Government's view, the burden on Dr. Foretich is merely incidental to legitimate purposes, so the burden does not make the Act a bill of attainder. The difficulty with this argument is that the Government appears to suggest that it can defend the constitutionality of the

statute simply by positing any nonpunitive purpose, regardless of the nature of the burden imposed or the relationship between that burden and the asserted goal. This view is entirely contrary to the prevailing case law noted above. The law is clear that if there exists an extraordinary imbalance between the burden imposed and the alleged nonpunitive purpose, and if the legislative means do not appear rationally to further that alleged purpose, then the statute in question does not escape unconstitutionality merely because the Government can assert purposes that superficially appear to be nonpunitive.

What is most noteworthy here is that the Government's asserted purposes in this case conveniently beg two telling questions: Why did the protection of Hilary's best interests require this legislation? Why were Dr. Morgan and Hilary unable to return "safely" to this country to reunite with their family before the passage of the Act? The only plausible answer to each question is that Congress believed Dr. Foretich had abused his daughter and posed a continuing threat to her security and well-being. The purposes the Government alleges thus cannot be viewed as nonpunitive.

This conclusion is inescapable when it is seen that the particular means Congress adopted in this Act belie any nonpunitive aim. Although it asserts that the Act is primarily concerned with promoting the best interests of the child, the Government offers no answer to the question of why the "best interest" standard of the Act was not made available in other child custody cases. If the disputed Act had been enacted to apply to *all* pending custody disputes involving children over 13, this would be a different case. Dr. Foretich would still have to secure Hilary's consent before obtaining any visitation with her. However, such a burden, while weighty, could not be viewed as "punitive" under the Bill of Attainder Clause.

In this case, however, the fact that Dr. Foretich was *singled out* for this severe burden belies the claim that Congress's purposes were nonpunitive. Evidently, Congress believed that the existing standard ordinarily applied in D.C.

custody cases was perfectly adequate to protect the best interests of mature minor children in all cases save one, the Morgan-Foretich custody dispute. Under the normally applicable standard, a Superior Court judge must take account of several factors in determining the best interests of the child, including the child's own wishes. *See* D.C. Code § 16-914(a)(3)(A). It is only in the Morgan-Foretich case that Congress chose to make the child's consent determinative. The Government asserted at oral argument that this alteration to the standard was necessary "to give a mature minor the right to say no, that she does not have to be with someone who she believes abused her." Yet, surely there are other "mature minors" in the District who prefer with good reason to be placed in the custody of one parent rather than the other. Apparently, in Congress's view, the best interests of those other children are adequately served by the existing standard. In light of the Act's narrow applicability, the Government's asserted purposes are simply implausible. It is the relative imbalance between the burden in this case and the implausible nonpunitive purposes that compels us toward a finding of punitiveness.

The Government responds that a statute is not "punishment" merely because Congress could have written it more broadly. It is true that underinclusiveness or specificity, alone, do not render a statute an unconstitutional bill of attainder. The statute must also inflict punishment. *See Nixon*, 433 U.S. at 470–72; *Brown*, 381 U.S. at 449 n.23. Nevertheless, narrow application of a statute to a specific person or class of persons raises suspicion, because the Bill of Attainder Clause is principally concerned with "[t]he *singling out* of an individual for legislatively prescribed punishment." *Selective Serv. Sys.*, 468 U.S. at 847 (quoting *Communist Party v. Subversive Activities Control Bd.*, 367 U.S. 1, 86 (1961)) (emphasis added). Therefore, the functional test necessarily takes account of the scope or selectivity of a statute in assessing the plausibility of alleged nonpunitive purposes. *See Selective Serv. Sys.*, 468 U.S. at 855; *Navegar*, 192 F.3d at 1067; *BellSouth II*, 162 F.3d at 690; *BellSouth I*, 144 F.3d at 67. Unlike our previous cases, the instant case is one in

which the narrow focus of the disputed Act cannot be explained "without resort to inferences of punitive purpose." *BellSouth I*, 144 F.3d at 67.

In this case, it is the Act's specificity that renders the asserted nonpunitive purposes suspect. And it is the Act's specificity that creates the injury to Dr. Foretich's reputation. If the Act applied in all custody disputes, its provisions for dealing with allegations of sexual abuse would not cast aspersions on any particular person. But as the Government concedes, the Act targets only Dr. Foretich. As a consequence, the Act officially associates Dr. Foretich with criminal sexual abuse because it implies that his daughter alone needs special protections. Whereas the statute at issue in *Nixon* created a "legitimate class of one," 433 U.S. at 472, and served significant public purposes beyond the burdens inflicted on former President Nixon, the Elizabeth Morgan Act creates a vilified class of one with no attendant nonpunitive purposes. Accordingly, we find that the Act imposes "punishment" under the functional test because it cannot reasonably be said to further nonpunitive purposes.

### 3. Motivational Test

The final test of legislative punishment is "strictly a motivational one: inquiring whether the legislative record evinces a congressional intent to punish." *Nixon*, 433 U.S. at 478. Under this prong, a court must inspect legislation for a congressional purpose to "encroach[ ] on the judicial function of punishing an individual for blameworthy offenses." *Id.* at 479. Courts conduct this inquiry by reference to legislative history, the context or timing of the legislation, or specific aspects of the text or structure of the disputed legislation. *See Selective Serv. Sys.*, 468 U.S. at 855 n.15; *Nixon*, 433 U.S. at 478-82.

Given the obvious constraints on the usefulness of legislative history as an indicator of Congress's collective purpose, this prong by itself is not determinative in the absence of "unmistakable evidence of punitive intent." *Selective Serv. Sys.*, 468 U.S. at 856 n.15 (quoting *Flemming v. Nestor*, 363 U.S. 603, 619 (1960)). " '[S]everal isolated statements' are not

sufficient to evince punitive intent," *BellSouth II*, 162 F.3d at 690 (quoting *Selective Serv. Sys.*, 468 U.S. at 856 n.15), and cannot render a statute a bill of attainder without any other indicia of punishment. Evidence in the legislative history can bolster our conclusion, however, where other factors suggest punitiveness. *See Lovett*, 328 U.S. at 312, 314 (finding an employment ban to constitute a bill of attainder where committee reports characterized the affected persons as "subversive" and "unfit" for government service); *cf. Nixon*, 433 U.S. at 479 (finding no bill of attainder where the relevant committee reports "cast no aspersions on appellant's personal conduct and contain[ed] no condemnation of his behavior as meriting the infliction of punishment").

In this case, the legislative history is replete with evidence that the statutory purpose of the Elizabeth Morgan Act was to "correct an injustice" and take sides in a notorious custody dispute. *Hearing* at 8, J.A. 41 (statement of Rep. Molinari). The focus of the Act and the unusual committee hearing in consideration of the bill demonstrate that the legislative process in this case amounted to precisely that which the Bill of Attainder Clause was designed to prevent: a congressional determination of blameworthiness and infliction of punishment. *See Nixon*, 433 U.S. at 468; *Brown*, 381 U.S. at 449 n.23; *DeVeau v. Braisted*, 363 U.S. 144, 160 (1960). For example, the chairman of the subcommittee spoke with apparent passion and sympathy for Hilary Foretich and stated that he sponsored the bill because he knew "how it feels to be filled with pain as a child." *Hearing* at 1, J.A. 37 (statement of Rep. Davis). Other members agreed that the Act was necessary to bring "justice and satisfaction to one little girl who can only be claimed as a victim." *Hearing* at 8, J.A. 41 (statement of Rep. Molinari). Members of the subcommittee also expressed contempt for the D.C. Superior Court's handling of the Morgan-Foretich case. The Act would provide a way of "deal[ing] with the inadequacies of the court system," so that by "bringing justice to this family, [Congress] can send an inspiring wake-up call to judges all over this country." *Id.*; *see also Hearing* at 5, J.A. 39 (statement of Rep. Wolf) ("I don't know why [Superior Court] Judge Dixon

didn't do anything.... What is wrong with them?"); *Hearing* at 7, J.A. 40 (statement of Rep. Morella) ("The original court order on this case is ... clearly outdated, and no longer addresses Ellen's best interest, if it ever did.").

The Government invites us to conclude that Congress's purposes were entirely benign on the basis of statements in the legislative record disclaiming any judgment as to whether Dr. Foretich had indeed abused his daughter. *See*, *e.g.*, *Hearing* at 3, 5, 6, J.A. 38-40. Aside from the fact that these statements appear conveniently self-serving, the Supreme Court has made clear that "a formal legislative announcement of moral blameworthiness or punishment" is not necessary to an unlawful bill of attainder. *Nixon*, 433 U.S. at 480. All that is necessary is that the legislative process and the law it produces indicate a congressional purpose to behave like a court and to censure or condemn. *See Brown*, 381 U.S. at 453-54.

The attempt by the Act's sponsors to broker a deal with Dr. Foretich for him to relinquish his parental rights removes any doubt that Congress's purpose in this case was to assume the role of a judicial tribunal and impose its own determinations of who was or was not a fit parent. *See Hearing* at 65, J.A. 69 (statement of Rep. Davis) ("Would you agree to vacate the order? If you do that, there's obviously no need for a bill."); *see also Hearing* at 59-61, 66-67, 84, J.A. 66-67, 70, 79. That Congress would not have enacted the Act if Dr. Foretich had voluntarily vacated the visitation orders reveals the true purpose behind the Act. Whether through negotiation or legislation, Congress's purpose was to overturn the Superior Court's orders so that Dr. Foretich could have no contact with his daughter. This legislative history alone cannot provide conclusive evidence as to the statutory intent behind the Elizabeth Morgan Act. It does suggest a congressional intent to punish, however. And, in combination with the absence of any plausible nonpunitive purpose, it reinforces our conclusion that the Elizabeth Morgan Act inflicts "punishment" within the meaning of the Bill of Attainder Clause.

### III. Conclusion

In enacting the Elizabeth Morgan Act, Congress determined that Dr. Foretich is a criminal child abuser and singled him out for punishment on that basis. For this reason, we reverse the judgment of the District Court and hold the Elizabeth Morgan Act to be an unconstitutional bill of attainder.

TATEL, *Circuit Judge*, concurring in part and concurring in the judgment: I agree that the Morgan Act violates Article I, Section 9 of the Constitution. I write separately because I do not share the court's view about why the Act fails the functional test for punitiveness.

Key to the court's analysis is its belief that the Act furthers "no attendant nonpunitive purposes." Maj. Op. at 37. Protecting Hilary from future abuse, the court concludes, is a punitive objective because Congress would have thought that Hilary needed protection only if it believed that Dr. Foretich had actually abused her. *See id.* at 35 ("The only plausible answer ... is that Congress believed Dr. Foretich had abused his daughter.... The purposes the Government alleges thus cannot be viewed as nonpunitive."). But Congress could have believed the accusations and yet passed the Act not to punish Dr. Foretich, but to protect Hilary from future abuse. Under those circumstances, the Act would not amount to an attainder because "[t]he question in each case where unpleasant consequences are [imposed] upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation...." *Flemming v. Nestor*, 363 U.S. 603, 614 (1960) (quoting *De Veau v. Braisted*, 363 U.S. 144, 160 (1960) (plurality opinion)) (internal quotation marks omitted); *see also Dehainaut v. Pena*, 32 F.3d 1066, 1071 (7th Cir. 1994) ("Even where a fixed identifiable group ... is singled out and a burden traditionally associated with punishment ... is imposed, the enactment may pass scrutiny under bill of attainder analysis if it seeks to achieve legitimate and non-punitive ends and was not clearly the product of punitive intent."). Thus, Congress could have imposed burdens on Dr. Foretich without violating the Bill of Attainder Clause so long as it did so while pursuing a legitimate objective and not in order to punish him.

Of course, if the legislative record contained little or no evidence to support the accusations of abuse, then Congress's acceptance of them and its consequent decision to burden Dr. Foretich would raise suspicions of punitiveness. But that is not the case here. Relying on testimony from numerous

experts and other witnesses, the D.C. Superior Court judge who presided for years over the Morgan-Foretich custody dispute found the evidence of abuse "in equipoise," *Morgan v. Foretich*, No. D–684–83, slip op. at 3 (D.C. Super. Ct. Aug. 18, 1987), *reprinted in* J.A. 306, i.e., that the chances that Hilary had been abused were fifty-fifty. Congress could thus have resonably believed that Hilary required protection, and nothing barred it from concluding that she needed more protection than the D.C. court had provided. *See BellSouth Corp. v. FCC*, 162 F.3d 678, 689 (D.C. Cir. 1998) ("Congress may read the evidence before it in a different way than might this court or any other . . . ."). For this reason, I think we have no basis for declaring the goal of protecting Hilary to be a "smoke screen" behind which Congress is hiding punitive motives. *See id.* (finding the functional test unsatisfied because "it [could not] be legitimately suggested that the risks of anticompetitive conduct were so feeble that no one could reasonably assert them except as a smoke screen for some invidious purpose" (internal quotation marks omitted)).

The court articulates a second reason for concluding that Congress acted punitively: if Congress thought D.C. law inadequate to protect Hilary, then it would have extended the Morgan Act to all D.C. child-custody cases. *See* Maj. Op. at 36 ("In light of the Act's narrow applicability, the Government's asserted purposes are simply implausible."). Congress may have decided against legislating more broadly, however, because the Morgan-Foretich case was the only one it knew about in which a court did not act to prevent future abuse of a child even though the child believed she had been abused and even though the court had found evidence of abuse. Recognizing the unique nature of each case, Congress may have been unprepared to place on other parents the onus it imposed on Dr. Foretich without knowing more about their particular situations. The Supreme Court accepted a similar explanation in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977). There, President Nixon charged that Congress had punitively targeted him by requiring that he turn his presidential papers over to the General Services Administration. The law did not, Nixon pointed out, address the papers of other presidents—either past or future—nor

did it address other officials' papers. Holding that this did not make the law punitive, the Court explained:

> Congress' action to preserve only appellant's records is easily explained by the fact that at the time of the Act's passage, only his materials demanded immediate attention. . . . Congress had reason for concern solely with the preservation of appellant's materials, for he alone had entered into a depository agreement . . . which by its terms called for the destruction of certain of the materials.

*Id.* at 472. Given that here too "the focus of the enactment can be fairly and rationally understood," *id.*, I cannot agree that Congress's decision to target Dr. Foretich makes the Morgan Act a bill of attainder. As long as Congress does not act to punish, it may legislate narrowly because its decision to resolve a case by legislatively determining guilt does not violate the Bill of Attainder Clause—punishment violates that clause. *See Selective Serv. Sys. v. Minn. Pub. Interest Group*, 468 U.S. 841, 846 (1984) ("A bill of attainder [is] . . . a law that legislatively determines guilt *and inflicts punishment* upon an identifiable individual. . . ." (internal quotation marks omitted) (emphasis added)).

To me, what makes the Morgan Act a bill of attainder is that the only legitimate, non-punitive objective the Act might plausibly have furthered—protecting Hilary from abuse—could have been achieved in a less-burdensome way, i.e., by prohibiting the D.C. court from granting Dr. Foretich *unsupervised* visitation. *See Nixon*, 433 U.S. at 482 ("In determining whether a legislature sought to inflict punishment on an individual, it is often useful to inquire into the existence of less burdensome alternatives by which that legislature . . . could have achieved its legitimate nonpunitive objectives."). Barring unsupervised visits would have guaranteed Hilary's safety without imposing on Dr. Foretich the extreme burden of effectively terminating his parental rights. That Congress eschewed this less-burdensome alternative and imposed an additional hardship that had no legitimate non-punitive purpose demonstrates the Act's punitiveness, rendering it a bill

of attainder. "[D]eprivations and disabilities [that are] so disproportionately severe and so inappropriate to nonpunitive ends . . . unquestionably . . . fall within the proscription of Art. I, § 9." *Id.* at 473.

This approach tracks the Second Circuit's in *Consolidated Edison Co. v. Pataki*, 292 F.3d 338 (2d Cir. 2002). There, the court found that the New York State legislature had a valid, non-punitive reason for requiring Con Ed, the sole target of the challenged law, to absorb the costs of a power outage that was at least partly its fault: if Con Ed did not absorb the costs, ratepayers would have to. "The legislature could legitimately conclude," the Second Circuit held, "that, as between Con Ed, the party that caused the outage, and the ratepayers, parties having nothing whatsoever to do with the outage, Con Ed should bear the costs attributable to its negligence." *Id.* at 352. The court had a very different view about the legislature's decision to bar Con Ed from recovering the outage costs that it would have incurred even had it not acted negligently. Because that "pil[ing] on," *id.* at 354, served no non-punitive purpose, the court concluded the statute was a bill of attainder. Here, too, even though Congress had a valid non-punitive reason for passing the Morgan Act, it impermissibly "piled on" an additional, entirely unnecessary burden. This punitiveness, combined with the Act's undisputed specificity, renders the Act a bill of attainder.

Perhaps seeking to avoid the consequences of this analysis, the government insists that Congress passed the Morgan Act in order to accomplish a different purpose—one for which no less-burdensome alternative existed. According to the government, Congress wanted to give priority to "a 14-year-old child's interest in being able to determine whether and to what extent she had to visit a non-custodial parent. . . ." Appellees' Br. at 50. Congress did this, the government asserts, in order to spare Hilary from trauma she might suffer were she forced to see a biological parent she believed had abused her. To satisfy the functional test, however, a goal must itself be legitimate. *See Nixon*, 433 U.S. at 476 ("Where . . . *legitimate* legislative purposes do not appear, it is reasonable to conclude that punishment of individuals

disadvantaged by the enactment was the purpose of the decisionmakers." (emphasis added)). The government's proffered goal fails this test. Because depriving Dr. Foretich of the ability to see his daughter without her consent infringed his right to control his child's upbringing, and because that right is fundamental, *see, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion), any infringement had to advance a compelling interest and be narrowly tailored, *see, e.g.*, *Reno v. Flores*, 507 U.S. 292, 301–02 (1993). Contending that the Act did further a compelling interest, the government cites cases that involve the protection of minors from physical harm. But those cases do not help the government, for Congress could have protected Hilary from physical harm simply by barring unsupervised visitation. Because giving Hilary the absolute right to terminate her father's parental rights represents an illegitimate goal, under the functional test it cannot save the Morgan Act.